Accordingly, we'll proceed to the first case, International Brotherhood versus NLRB. Mr. Scharmer, just let me confirm that counsel on the other side are on. Mr. Lauro, are you there? Yes, I am, your honor. Mr. Moritz, are you there? Yes, your honor. Please proceed. Thank you, your honor. And may it please the court, my name is Manish Sharma. I represent IBW Local 43 in this matter. The board's decision that the company's unilateral scheduling change to a mandatory six-day workweek for all technicians, except those enrolled in higher education courses, rests on an untenable interpretation of the party's collective bargaining agreement. An interpretation that this court has recognized is owed no deference. According to the board, the company's action fell within the compass or scope of contractual language granting the employer the right to act unilaterally because the provision in the management rights clause granted the company the right to determine the amount of work needed. And another provision obligated the company to pay overtime wages for certain hours work, including for those unscheduled days off. But the overtime provision is not contractual language granting the employer the right to act unilaterally at all. And the right to determine the amount of work needed does not say anything about when technicians should be scheduled to perform that work, especially as that right is expressly subject to the terms of the agreement, including specific scheduling provisions. Thus, the board reads broader rights into those two provisions than the language can bear. And its interpretation is inconsistent with the directly applicable scheduling. What is, you know, the argument is that Article Six sets forth the normal hours. And when you read that together with Article One, if there's something beyond normal hours, the employer is obligated to pay overtime. But their fair reading is that Article Six doesn't limit how much overtime. Well, I believe that it does. What's wrong with that interpretation? Well, so there's a couple of things. Yeah. So first of all, the board in its brief offers that explanation that that Article Six, Section One only delineates the sort of 40-hour work and Article One and Section Three of overtime provisions talks about work outside that. That's not provided within the board's decision itself. The board provides that post hoc. And this court can't affirm the board's decision on an explanation. It didn't provide itself in its decision. So that's the first thing. Second thing is, it's actually inconsistent with the way the board itself interpreted the provisions of Article Six, Section One. The board says that as it relates to installation technicians, that those provisions allowed for the inclusion of an extra day in the work week. So if it does include for extra work to be assigned through the process of Article Six, Section One, then you can see how their interpretation of Article One and overtime provisions would then render those provisions superfluous. The idea is that the parties... But I'm reading the board's decision. I have the decision in front of me and it says read together, the provisions authorize the employer to determine the amount of work needed the technicians to perform and to require technicians to work in excess of 40 hours a day. That is indeed the board's... What's wrong with that interpretation? Let me ask it that way. Well, sure. Because Article Six, Section One specifically says, it lists the four or five day work week that service technicians and installation technicians can be assigned to. And then it lists out some periodic departures that can be made in a limited fashion from those. They can add an hour to the service employees, service technicians, employees. The union's position is the employer cannot deviate from what's listed in Article Six unilaterally. Unilaterally on a mandatory basis. They do on a voluntary basis all the time. I'll give you an example, Your Honor. That not got the provision in Article One, which says it has the exclusive right to determine the reasonable amount of work needed. No, Your Honor, I don't believe it does. And for these reasons. So the natural, the plain meaning of the words, the amount of work needed, it doesn't naturally encompass a scheduling right. And one good illustration of this is the fact that that's actually a common right that gets bargained into management rights clauses. And the union cites a number of examples of these in its brief. And typically the parties in those cases will use terms like the right to schedule, the right to assign work hours, right to determine work shifts, things like that. This would be a very abnormal articulation of a right to schedule work. And also it relates to different rights that the employer would have. For instance, it seems to me that you have omitted from your argument something that could be of crucial importance to your side of the case, which is that arguably the employer has deviated from what the contract provides, that it is indisputable that the employer has not provided in accordance with the contract, because both CBAs provide that in such circumstances, quote, the company will first seek qualified volunteers to perform such work. And if there are no qualified volunteers, then the least senior qualified person will be assigned to perform the work. Now, the employer didn't do that. The employer had arranged it in a special way in which it granted certain exemptions. And the employer, I think, indisputably did not conform to what the contract provides. That seems to me to be of considerable importance, but you haven't mentioned it. Oh, absolutely, Your Honor. And I think that's absolutely right, that even if the employer wants to deviate from the work schedules, it has to do it through the processes outlined, when doing so mandatory, outlined in Article 6, Section 1, which is first seek volunteers and then assign through reverse seniority order. And that the course of performance had been that the company would seek volunteers, and if they couldn't find them, it would ask the union to help, and the union would usually secure those volunteers. And that definitely didn't happen. Would that claim be covered more by your contract modification claim, which you are not pursuing on appeal? Not necessarily, Your Honor. In implementing these provisions, or the six-day work week, the employer did not follow those provisions. Why is that not a contract modification claim as opposed to the failure to bargain claim? Yeah, Your Honor, I don't believe that those are mutually exclusive. And for instance, this court in Healthbridge found that the employer in that case violated 885 through a unilateral change in refusal to bargain, even though the court found that the issue there was covered by the contract and prohibited the employer from making that change. So even in that case where the employer breached the contract, the court still found it an 885 unilateral change and not a contract modification. It seems to me the employer cannot claim to have done what the contract permitted the employer to do, even if one takes the position that otherwise the employer would have been acting within the scope of what the contract allowed the employer to do, given the fact that the employer indisputably did not follow the procedures and assign work on the basis that was prescribed by the CBAs. The employer simply can't sustain the position that the CBAs allowed what the employer did. I believe that's right, Your Honor. I have an observation that I think also is relevant, and that is this argument that's made by the employer about the normal work schedule versus something else. But when you read that provision, it says the normal work schedule shall be a shift of eight and a half hours for five consecutive days. And then the next sentence says there will also be a four-day work week. Presumably that's not the normal work week. That's a four-day work week, comprised of – I mean, it could be read that way. That's a four-day work week. And when it comes to the installation department, you don't have that dichotomy. It's just the five-day work week. They do also mention an additional shift for residential installers, but that shift doesn't add any days. That shift runs from Tuesday through Saturday, so there's still two days off, Sunday and Monday. So that's a five-day work week there. They didn't need to talk about the normal work schedule for the installation department. They just talked about the normal work schedule for the service department. And then they had the five-day work week, and then they said there will also be a four-day work week. It seems to me that that can be read as the exception to the normal work schedule, the four-day with 10 hours. And the other thing is the language itself in the employer's rights, it talks about the reasonable amount and quality of the work here, but it doesn't say – as you said, it doesn't say anything about extra hours or extra days of work. And if so, if you do get into extra days of work, then you have to – then there's a whole question about it being voluntary and all the points that Judge LaValle made. I should be pointing this out to the other side, I guess. I wholeheartedly agree, Your Honor. And just a couple of quick points on the amount. That amount does tie to other provisions within the contract. For instance, there's a layoff provision that layoffs due to lack of work. So determining the amount of work, the employer can determine that there's more work than – or less work than there is available to technicians, and so technicians could be laid off, or vice versa. It can determine that there's more work and some technicians can be recalled, things like that. It seems to me it's like it's a general provision, more of a general provision, and then details are filled in by other provisions. Exactly. And it reads as that it's subject to the terms of the agreement. So if you look at that, then you determine the amount of work, you determine how is that scheduled, you look at Article VI, Section 1. Right, of course. That's the last phrase in that section. Subject, however, to the provisions of this agreement. All right. You have three minutes for rebuttal. Let's hear from the Board. Thank you, Your Honor. May it please the Court, Greg Lauro for the National Labor Relations Board. In this case, the Board properly found that the employer's action was covered by or within the scope of its agreements under its desk, which does not require that the contract specifically refer to the action in question in order to cover it. As the Board explained, the action here is covered by two contractual provisions. One, giving the employer the right to determine the amount of work it requires, and two, an overtime provision expecting payment for overtime, including that's scheduled on regular days off. And it was read together that the Board found that it covered the employer's action here, and the Board responded. Mr. Lauro, what happens if we were to conclude that there is some ambiguity here? You know, in an everyday contract case, you'd have a trial and try to interpret the contract, but what happens here in the context of a petition for review if we think both sides have some arguments with respect to their interpretation of the language? Well, I think that goes to the heart of the contract coverage standard, Your Honor, where the courts are cognizant of the fact that the parties can't anticipate and cover every hypothetical, and they don't have to specifically mention an action to cover it. So here, while the normal schedule provisions cover just that, the regular schedule wasn't changed here. The employer had a right under the Management Rights Clause and the overtime provision to determine that it needed more work than the regular schedule, and to assign that. And as long as that's covered by the contract... Counselor, the problem with that is that there is a provision. There's no doubt that overtime can take place, but it's subject to certain restrictions, and it's voluntary, and it's explicitly provided for if it's voluntary, and the procedures for picking the people to do that work spelled out, which were not followed by the company here. But it does say in the Employer's Rights Provision at the end that it's subject, however, to the provisions of this agreement. And then when you look at the other provisions of the agreement, I don't see any help for you. I don't see any help in Section 6, Article 6, Section 1, and I don't see any help in Article 6, Section 3. Section 3 provides for pay for overtime, but there's no question that there can be overtime. It's just a question of the procedures that have to be followed before there can be overtime. But once there's overtime, then, you know, you're compensated at a time and a half for overtime. So it all seems to hold together with nothing being nullified here. Because reasonable amount and quality of work doesn't speak to hours, doesn't speak to extra days. So it could be read as a whole in the company, in the board's favor. Your Honor, if I may, there's a couple of important points there that you've raised, and I'll address them. I think first I'd like to speak to how the contract pulls together. You do have a normal or default schedule provision, and you also have a right to determine the amount of work needed and to assign overtime on days off. And the board reasonably, given that structure, it made sense for the board to read the management rights and overtime provisions to cover the temporary addition of additional work. But the question becomes, what happens if you adopt the union's position that Article 6, Section 1, the normal schedule provision, covers all the circumstances in which you can ask the service techs to do more work? Now I would point out at page 15 to 16 of their opening brief, they said there's only one provision that allows that. It's Article 6, Section 1, and it only allows you to start the service technician's shift an hour earlier, which would seem to preclude overtime, which shows that interpretation makes no sense. Though they backtrack in their reply brief and say maybe it allows adding an hour of overtime, that would still make little sense of the purpose of the management rights clause in determining how much more work you need. And if I may speak to the volunteer in this issue, although we point out that that goes more to the contract modification issue, to the extent it's relevant to the contract coverage issue, my opponent's argument fails on the facts because the board found this was an all-hands-on-deck situation where they needed all available technicians. And in that circumstance, the contract does allow for the imposition of mandatory overtime. And that's how the union's witnesses, the employees and an official, understood it. They understood that the employer could decide how many volunteers it needed, and if not that many were available, and this is an insufficient number, the overtime... But the employer didn't do that. The employer didn't get all hands on deck because the employer had granted exceptions which were inconsistent with the contract. You, in your argument, you have not in any way referred to the issue that I raised with your adversary before, which is that the employer simply did not follow what the contract prescribed. The employer made its own decision of how it will, of who it will call and who it will exempt. This was not authorized by the contract. Indeed, it was explicitly, the contracts are explicitly to a different effect. So how can you say that the employer has done what is clearly called for by the contract? Or even if it doesn't have to be clearly called for, it's simply not what the contract provides. If I may, your honor, consistent with the contract, the employer required extra work by all available technicians. My opponent cites nothing in the contract or the party's practice... Well, the employer granted exemptions. Exemptions because of child care and because of available. It made its own decision to exempt certain persons for reasons that were satisfactory to the employer. Can the child care exemption, the board found to be a violation that wasn't covered by the contract, but as to the education exemption, my opponent seems to be ignoring that those employees weren't available due to a benefit for the employees. Prepaid educational classes and there's nothing suggesting the employer should force them to pull out of educational classes that the union and the employees it represents enjoyed or that there was any practice for doing that. I think that approach by the union would negate the purpose of the agreement and also to defeat, to carve out the management right ability to determine the amount of work by requiring the employer to solicit volunteers when it needed everyone. In this situation, it wouldn't make a difference. It would be a mere formality. And again, everyone recognized that the contract allowed for the requirement of mandatory overtime in those circumstances where there would be an insufficient amount of volunteers. If I understand correctly... I just don't understand that point you just made. There wasn't a provision that allowed for mandatory overtime that I'm familiar with, except maybe the 7 a.m. point in Article 3, Section 1. But there is no explicit mandatory right for them to assign extra work beyond maybe that one provision. Well, I mean, as I believe your honor is pointing out, if I'm understanding correctly, the board in footnote 9 did note that Article 6, Section 1 can provide for mandatory overtime for the installation technicians. But I'm just pointing out that my opponent's interpretation now is inconsistent with what their witnesses acknowledged on the stand that the contract did allow the employer to assign mandatory overtime when there was an insufficient number of volunteers. Yes, there is a volunteerism provision, but you don't stand on that formality when you don't have enough volunteers to get the work done. That was contrary to the view of the contract. And I would say contrary to the language of the agreement as the board interpreted, where you have a management right provision that allows you to determine the amount of work, which viewed in light of the overtime provision reasonably means you get to determine how much you need in addition to the regular work schedule, including assigning it on a day off. Am I not correct in the understanding that what is at stake here is not whether the employer could come out where it wanted to come out in the end? What is at stake is simply the question whether the employer needs to bargain in good faith. And bargaining in good faith simply requires sitting down. This is what I want to do. This is what we want to do. And is this acceptable to you? And if the union makes counter proposals, as long as the employer listens to them in good faith and isn't simply pretending to bargain without any intention to yield an inch or a centimeter on any subject, the employer has done what it needs to do. And it can come out and say, no, no, I'm sorry, that would not permit us to realize what we need. We'll listen in good faith to your proposals. But it's got to satisfy our needs. And it can come out at the end exactly where it started without violating the obligation, as long as it is listened in good faith and to reach an accommodation. I understand your honor. But the gravamen of the contract coverage standards that applies here is that the parties have already bargained. The result of that bargain is in the contract. And therefore, if the board finds that the action in question was covered by the contract, then the parties are not required to bargain further. So it covers the need for sites no factually analogous case under the contract coverage standard that bars the board's finding here. And that's because as I understand it, there is no set. Thank you. Well, we'll hear from the employer. Thank you, your honor. You're on mute. Thank you. Good morning, may it please the court, Jeremy Moritz of Ogletree Deacons for Intervenor ADT LLC. I want to make a couple points up front. Number one, absent from this equation is any claim that the company acted on anything other than completely legitimate customer needs and business consideration. It's not a case where any anti unanimous or other improper motivation drove the decision. I want to let you have a question that was asked a few moments ago about look, what occurs if there's ambiguity. And my view of this is that's precise point, the parties did bargain. They use the word normal schedule to strongly imply that they're abnormal schedules. But even if you don't accept the company's position and its interpretations, there is a difference between a contract violation, which belongs to an arbitrator, and a federal statutory violation, which is the province of the board. It is precisely that reason that the board standards is it covered by the contract? Is there an arguable base, which is distinct from a dead bang winner? There are at least a colorable arguable basis. Employers position is slightly different than what an arbitrator may have come out. Had this been sent to him or her in the first instance. Government Council made the point that things were already bargained for in addition to the very specific scheduling and management rights provisions. What was also a bargain was a grievance arbitration procedure where these ambiguities to the extent they exist, can you respond to the union's argument that, you know, in the management rights provision, it uses the phrase to determine the reasonable amount of work needed. And that the sort of the industry standard is if you want to talk about schedule, you would you would say the right to schedule. So in other words, the first the language, the reasonable amount implies just how much work, but it doesn't give the exclusive right to set the schedule. Two points on that, Your Honor. The first is, as noted, the union readily adhering that Saturday work, perhaps not to this extent, but as a routine event. The second point is the same one I made earlier that we believe the amount covers a Saturday schedule. But even if that is not the case, our argument is colorable. It's arguably correct interpretation, perhaps not the most precise for a statutory violation. Again, we hear any employer does not need that simply need a colorable, reasonable interpretation for their action and reasonable interpretation of the amount of work. Doesn't that relate to how many employees will be on the job, as opposed to how long a particular employee will work. And, you know, you hire up workers, they and let workers off, as was pointed out earlier, because there's not enough work or because there's more work than you are more, more workers, the employer would do. And it doesn't speak to the question of additional days of a particular shift or hours of a particular day of overtime, which is, is spelled out elsewhere, what the work week should be. In sections in Article six, section one. And my response to that is precisely my earlier point. I believe that the amount of work speaking to the individual amount of work imposed on an employee, if I give the counter argument on it for the job, perhaps that perhaps it is only speaking to staffing levels. Okay, so be it, let's assume that both of those are fair points. But that's the precise ambiguity that belongs. Whichever side of that argument you come down on does not create Section 80 or Section 885 unilateral change or midterm modification claim. It simply can't perhaps, in the light most favorable to the union, it's a contract violation. Contract has a procedure for contract violations. Your point is it's not an unfair labor practice. Even assuming it's a breach of the contract, even assuming an arbitrator might find it's a breach of contract is not an unfair labor practice, because in good faith relied upon on a standard applied contract coverage or arguably correct interpretation before acting. That's precisely correct. Thank you. We'll hear Mr. Sharma's rebuttal. Thank you, Your Honor. You just heard the company's attorney say that the standard is that it just needs to be a colorable and arguable position. That's not at all the standard for contract coverage. And to Your Honor Shen's point about what to do in a case of ambiguity, the board's interpretation in that instance fails. The board has to be right in its interpretation. If it's not, it fails. And one example of that is in this court in local union 36, the local union 36 case rejected the employer's proffered interpretation when it said, well, that's a plausible reading of the contract, but it's not necessarily correct. And that's a standard, the standard there that this court uses a two-step framework, which the board in its MV Transportation case at page 14 of its slip opinion, it says that contract coverage is the first step in that two-step standard. And that standard resembles the standard we adopt today. So I think that that would be consistent. The local union 36 approach to that question is consistent with the way the board applies its contract coverage. Your adversary made the point that there might be an absence of coverage, but that still wouldn't necessarily be a violation of the act. In other words, he's drawing a distinction between a contract that doesn't cover a particular action and that the company takes and whether the company would be held to be in violation of the act because it acted in good faith and it believed that what it was doing was covered. Your Honor, that's simply not the standard that if the contract coverage is determined whether or not the parties have bargained over this and placed it in the agreement, if they haven't done that, then there's an obligation on the employer's part. The bargain with the union prior to making a unilateral change that there's no good faith standard. It's not where they're trying to undermine the union or not. They could have acted in good faith, but if it's determined that the action is not covered by the contract, then that simply means that the parties have not bargained about it yet and they need to. That's what the union seeks. Judge LaValle's point is that the company approached the union prior to making these type of actions and that's why the union came to the board because the board can provide a perspective relief and tell the company in the future if you intend to do this, you have to bargain with the union prior to doing it. That's the point you're making. But the reason for this case is before us is you want to have a ruling that requires in the future whenever the company wishes to add hours or add shifts, add days to the work week, that they come to the union and bargain. It's almost like a declaratory judgment in a sense. In a sense. Well, would the case be the same? Were it not for the provisions in the CBA that the company first seek the qualified, were it not for the disparity between what the company did and what the CBAs provide about the procedure that's called for when adding such hours? I, so your honor, I would say that the union's position is that the two provisions that the board relies on don't provide the rights that it claims are there. And in particular, that becomes clear when read in light of the article six, section one procedures. It's hard to say, but it's not, it's not so clear to me that the case would come out the same way if the employer had not granted those exemptions and had followed and had followed what both CBA, what both CBAs say about first seek qualified volunteers and then proceed in the other. Your honor, I would say it would be, that's, that could be true for the installation technicians, but not for the service technicians. Service technicians, it doesn't allow for them to add an extra day in the language related to them, possibly for the installation technicians, had they followed the procedure and may have come out differently, but they didn't do that here. Thank you. Thanks to all of you. The court will reserve decision.